Case 102—INDICTMENT—September 23.

## Johnson v. Commonwealth.

APPEAL FROM PIKE CIRCUIT COURT.

1. INSTRUCTION AS TO SELF-DEFENSE.—Upon the trial of appellant for murder the court did not err in instructing the jury that they could not acquit, upon the ground of self-defense, if they believed from the evidence, "that at the time of the killing of deceased the defendant brought on the difficulty with him and sought his life.".  While the intention with which the difficulty was "brought on" must be submitted to the jury in order to prevent such an instruction from misleading, and that intention must be to kill or seriously injure, yet in this case the felonious intent with which the difficulty must be believed by the jury to have been brought on sufficiently appears from the use of the words, "and sought his life."

2. SAME.—Although the killing took place on the premises of accused, he was not prejudiced by an instruction telling the jury that they could not acquit on the ground of self-defense, if he had any "other safe or apparently safe means of escape or protection," as there was

Johnson v. Commonwealth.

at the only time when defendant could, if ever, have reasonably believed himself to be in danger, manifestly no possible avenue of escape from the danger, and it is evident that the jury thought he was never in any danger from which he was required to escape.

3. PREJUDICIAL ERROR.—An instruction telling the jury they were the judges of the character and credibility of the witnesses was not prejudicial, as the effort of the Commonwealth to impeach the character of defendant's witnesses resulted in establishing overwhelmingly their reputation for truth and veracity.

4. THE COURT DID NOT ERR IN REFUSING A CONTINUANCE on account of the absence of witnesses, as the trial was had four years after the indictment was found, and the affidavit disclosing what the absent witnesses would testify was read as a deposition.

5. IMPEACHMENT OF ABSENT WITNESSES.—It was not error to allow the Commonwealth to impeach the reputation of the absent witnesses, as their testimony was placed upon the same footing as that of witnesses who were present.

STEWART & STEWART FOR APPELLANT.

1. The qualification of the instruction. as to self-defense was erroneous. (Thompson v. Commonwealth, 13 Ky. Law Rep., 39; Allen v. Commonwealth, 86 Ky., 642.)

2. Appellant being on his own premises was not bound to flee, and the court erred in telling the jury, in substance, that he had no right to stand and defend himself if there was any other apparently safe means of escape. (Bledsoe v. Commonwealth, 9 Ky. Law Rep., 1002; Wright v. Commonwealth, 8 Ky. Law Rep., 718.)

3. It was error to instruct the jury that they were judges of the character and credibility of the witnesses. (Wright v. Commonwealth, 8 Ky. Law Rep., 723.)

WM. J. HENDRICK, ATTORNEY-GENERAL, FOR APPELLEE.

1. The court properly instructed the jury that the defendant could not be acquitted on the ground of self-defense if he himself brought on the difficulty, or placed the deceased in an attitude in which he was bound to defend himself. (Oder v. Commonwealth, 80 Ky., 32; Lightfoot v. Commonwealth, Idem, 516; Farris v. Commonwealth, 14 Bush, 362.)

2. The defendant was not prejudiced by the refusal to continue on account of the absence of witnesses, as he obtained the benefit of their testimony by reading, as their depositions, the statements contained in the affidavit for a continuance. (Crim. Code, sec. 189, Amendment of May 15, 1886.)

3. It was not error to allow the Commonwealth to impeach the absent witnesses.

**JUDGE HAZELRIGG** DELIVERED THE OPINION OF THE COURT.

The appellant was indicted for the murder of William King at the February term, 1889, of the Pike Circuit Court. At the March term, 1893, he was put upon trial, convicted and sentenced to the penitentiary for life. Assigning various errors, he has appealed to this court.

It appears that the accused had a still-house, where he made brandy. King was his neighbor, and appears to have frequented the place—at times getting something to drink and at other times failing. Appellant was in dread lest King would report him to the marshal, and the proof is abundant that he had, on several occasions, threatened to kill the deceased. On the day of the killing, when he saw King coming, he said, "There comes a damned dangerous man," alluding, as we gather from the proof, to the danger of being reported to the marshal. Several persons had gathered there on that occasion (Sunday morning), and were engaged in drinking brandy. Appellant said during the morning that "that day's work would ruin him." He was also heard to say that morning, "I'll be d—d if Bill King shall bother me any more." He got into a row with one Maynard, in which King acted as peace-maker. He said to King that "if he was a friend of Maynard, he was no friend of his." King answered that he was a friend of both. He "gave King the d—d lie" twice or more. This was down at a gate some distance from the still-house. Appellant then invited King to go and get a drink, and they walked off, arm in arm, both drunk, or drinking, and so indeed were all the parties present.

Johnson had a gun and a pistol. King was wholly unarmed. After getting perhaps a hundred yards from the gate, Johnson was seen to pat his cheek at King, and was heard to say by one witness nearer than the others, "Hit me if you dare." He did this two or three times, when King knocked him down with his fist, and was standing over him quietly, with his head hung down, but making no demonstration or effort to do any thing further. He had nothing in his hands. Johnson, after falling, and while on his back, fired with his pistol, striking King in front, who thereupon fell. He died the next morning.

The defendant proved that on several occasions previous to the killing, King had threatened to kill him, and on one or two occasions had made some effort to do so, and on the day of the trouble called him a damned liar. He testified that King knocked him down, and he knew nothing for a short time, and when he recovered consciousness he saw King stooping over him with a rock in his hand in a threatening attitude, and is corroborated by his daughter, and perhaps another witness. This is not corroborated, however, by the other witnesses. The appellant complains of all the instructions given, but most seriously of the qualification of his right of self-defense as given in the fourth.

By the first, second and third instructions was given the law as to murder, manslaughter, and what the finding should be in case of doubt as to the degree of guilt.

By the fourth they were told that mere threats made by the deceased to take the defendant's life

would not excuse or justify the defendant in taking the life of King, unless they should believe from the evidence, that at the time Johnson killed King, if he did kill him, defendant believed and had reasonable grounds to believe that King was about to carry out said threats and take his life, or inflict on him great bodily harm, and that there was no other safe means, or apparently safe means, of protection or escape, but to kill King, and if the jury so believed and find, they should excuse him on the grounds of self-defense and apparent necessity, and find him not guilty, "unless the jury should further believe from the evidence, that at the time of the killing of King, the defendant brought on the difficulty with him and sought his life, and if they should so believe they can not excuse or acquit him upon the grounds of self-defense or apparent necessity."

In a subsequent instruction the law as to reasonable doubt was given.

It is contended that this court, in Allen v. The Commonwealth, 10 Ky. L. R., 582, held that the jury should be required to believe beyond a reasonable doubt "that the accused *willfully* brought on the difficulty with the deceased for the *purpose* and with the *formed design* to kill him or inflict serious injuries on his person, before they were authorized to deprive the accused of his right of self-defense."

It is argued that the difficulty may have been "brought on" with no felonious or unlawful intent, or even innocently, and such indeed has been the criticism of this court in several recent cases on both the form and substance of instructions similar to this

one. The expression "brought on" has been said to give the jury too much latitude—to leave out of view the intention upon the part of the accused and the manner of bringing on the difficulty. In quite a recent case it was held to be probably prejudicial to the rights of the defendant, because he had gone to the house of the deceased, when an altercation occurred which finally resulted in the defendant killing his antagonist. It was thought the court indicated to the jury, by his merely going there, innocent though he was of any intention to harm the deceased, that this was "bringing on" the difficulty in the broad meaning of the instruction. Therefore, it was said that the intention with which the difficulty was brought on must be submitted to the jury. That intention must be to kill or seriously injure, and must be confined to the immediate occasion of the killing. In the present case, the jury were required to believe that the accused brought on the difficulty at the time of the killing and was then and there seeking *the life* of the deceased, before they could deprive him of the right of self-defense. There was no circumstance in proof prior to the killing in which the accused figured as an innocent factor, and yet which might have been thought by the jury to have brought on the difficulty and by which the jury might have been misled. The felonious intent with which the difficulty must be believed by the jury to have been brought on, sufficiently appears from the use of the term "and sought his life." And manifestly these terms were not misunderstood. Though not strictly or legally so apt, they are suggestive to the ordinary mind of most nefarious design.

To seek a man's life is the embodiment of criminal intent, and suggestive of the foulest assassination. And that the accused thus "sought the life" of King at the time of killing him, the jury are told to believe before depriving him of right of self-defense. Moreover, when the Commonwealth established the fact that the accused had threatened to take the life of the deceased, it was not then a question merely of his necessary self-defense that was before the jury. His whole previous conduct towards the deceased and declarations concerning him were under scrutiny, and by these evidences of hostility and enmity, the intention of the accused was properly gathered at the time of the fatal meeting.

Under the facts submitted to the jury in this case, we think it impossible for the jury to have been misled by this instruction. By a subsequent and independent instruction the defendant was given the usual law of self-defense without qualification.

It is further urged, on the authority of Bledsoe v. Commonwealth, 9 Ky. L. R., 1002, that the instructions should not have been qualified by the expression "other safe or apparently safe means of protection or escape;" that as the killing was on the premises of the accused, as in the Bledsoe case, he was not bound to flee, but had the right to stand and defend himself. But the merest glance at the evidence will show that these words of qualification were not misleading. If ever applicable, it was when the defendant was on his back on the ground. If there was ever a time when he was in danger, or could have reasonably believed himself to be in danger, it was

when he was knocked down, and there was then manifestly no possible avenue of escape from the danger. It is evident the jury thought that he was never in any danger from which he was required to escape, and so found him guilty of murder.

Instruction six as to the jury judging of the character and credibility of the witnesses was not prejudicial. The effort of the Commonwealth to impeach the character of some of the defendant's witnesses, while it affected their general moral character to some extent, resulted in establishing overwhelmingly their reputation for truth and veracity.

The motion for a continuance was properly overruled. The indictment was found in February, 1889, and the defendant was brought to trial some four years thereafter. The affidavit disclosing what the absent witnesses would testify was read as a deposition; nor did the court err in allowing the Commonwealth to impeach or attempt to impeach the reputation of the absent witnesses. Their testimony was placed on the same footing as that of witnesses who were present and their characters subject to the same tests.

We think that the defendant obtained a fair trial, and the judgment is affirmed.